## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MATTHEW CYDYLO, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,<br><br>          Plaintiff,<br><br>    v.<br><br>AGILIS ENGINEERING, INC., BELCAN ENGINEERING GROUP, LLC, CYIENT, INC., PARAMETRIC SOLUTIONS, INC., QUEST GLOBAL SERVICES-NA, INC., and RAYTHEON TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, MAHESH PATEL, ROBERT HARVEY, HARPREET WASAN, STEVE HOUGHTALING, THOMAS EDWARDS, GARY PRUS, FRANK O'NEILL<br><br>          Defendants. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Matthew Cydylo, individually and on behalf of a class of similarly situated individuals, brings this action for damages and injunctive relief under the antitrust laws of the United States against QuEST Global Services-NA, Inc. (*QuEST*), Belcan Engineering Group, LLC (*Belcan*), Cyient, Inc. (*Cyient*), Agilis Engineering, Inc. (*Agilis*), Parametric Solutions, Inc. (*PSI*) (collectively QuEST, Belcan, Cyient, Agilis and PSI are referred to herein as the *Supplier Defendants*), Raytheon Technologies Corporation, Pratt & Whitney Division (*P&W*), and Mahesh Patel, Robert Harvey, Harpreet Wasan, Steve Houghtaling, Thomas Edwards, Gary Prus, and Frank O'Neill.

## I.   SUMMARY OF THE ACTION

1.      This class action challenges an illegal conspiracy among P&W and several outsource engineering suppliers (i.e. the Supplier Defendants) to restrict the hiring and recruiting of engineers and other skilled laborers working on aerospace projects (*Engineers*) among their respective companies (the *No-Poach Agreement*).

2.      Defendants entered into and maintained this No-Poach Agreement at least as early as 2011 and continued it until at least 2019. Throughout this time, and indeed until just recently, Defendants concealed their No-Poach Agreement from their employees and independent contractors.

3.      The scope of the No-Poach Agreement was broad, covering at least all Engineers employed by (or working as an independent contractor for) Defendants to work on P&W projects and statements of work in the United States and its territories.

4.      This No-Poach Agreement was intended to, and did, reduce competition for Engineers' services and, as a result, suppressed the job mobility of and compensation to Plaintiff and the members of the proposed Class (defined below) below the levels that would have prevailed but for the illegal No-Poach Agreement.

5.      Defendants reached their unlawful horizontal agreement at the highest levels of their organizations, through verbal agreements that were later confirmed by Defendants, by their conduct and in their emails, which they agreed to conceal from outsiders, from their respective employees who make up the proposed Class, and from the public. As described below, Defendants' senior executives periodically reaffirmed, monitored, and policed the No-Poach Agreement.

6.      The No-Poach Agreement was first brought to light by the DOJ on December 9, 2021, when it partially unsealed a criminal antitrust action against the Director of Global Engineering Sourcing at P&W, Mahesh Patel. In a supporting affidavit from an DCIS agent, the DOJ alleged that Patel conspired with the Supplier Defendants to restrict the hiring and recruiting of Engineers with the goal and effect of

suppressing Engineers' compensation wages. *See* Aff. in Supp. of Criminal Compl. and Arrest Warrant, *United States v. Patel*, No. 3:21-mj-1189, ECF No. 15 (D. Conn. Dec. 9, 2021) (*DCIS Affidavit*).

7.     Then, on December 15, 2021, the DOJ filed a new criminal indictment, naming Patel, as well as Robert Harvey, Harpreet Wasan, Steven Houghtaling, Tom Edwards, and Gary Prus as defendants (and all of which are named as Defendants herein), and charging them with all with one count of violating the Section One of the Sherman Act. The indictment quotes extensively from email correspondence among the individual defendants, in which they discuss, memorialize and police the No-Poach Agreement alleged in this complaint (hereafter the *December 15 Indictment*).

8.     The DCIS Affidavit and the December 15 Indictment outline how Defendants, through their officers, directors, agents, employees, or representatives, agreed not to compete for the services of each other's Engineers, specifically by agreeing to restrict the hiring and recruiting of Engineers between and among Suppliers in the United States and its territories.

9.     The No-Poach Agreement manifested in interwoven and overlapping hiring and recruiting restrictions, all of which had the common purpose of limiting competition for, and thereby restricting the free movement and compensation of,

Engineers within the aerospace engineering industry. The No-Poach Agreement thus artificially extended Engineers' length of work at a given employer and reduced or eliminated their ability to advocate and obtain better terms of employment, including compensation, at current and future employers. Indeed, because an employees' compensation at a subsequent job is based in large part on what that employee was earning in the job which she seeks to leave, the wage depression caused by Defendants' conduct may stay with the employee for years, or decades.

10.     The hiring and recruiting restrictions that make up the No-Poach Agreement were shaped by Defendants' shared financial motivations, specifically a desire to suppress wages and thereby lessen labor costs in fulfillment of aerospace contracts.

11.     Defendants monitored each other's compliance with the unlawful No-Poach Agreement and communicated regarding deviations from it in order to enforce compliance. For instance, Supplier Defendants repeatedly reported perceived rule breaking by their co-conspirators to Patel, who in turn directed that such violations of the No-Poach Agreement cease immediately. And, Patel had the ability to punish violators, by withholding future lucrative work from the violator.

12.     Defendants directly linked the operations of the No-Poach Agreement to the financial benefits that would accrue to them from suppressing wages, noting, for

example, that discipline in "not hir[ing] any partners employee" was essential to "pre[v]ent poaching and price war." DCIS Affidavit, ¶ 24.

13.     The No-Poach Agreement was made and enforced privately, confidentially, and at the highest levels of the organizations, and thus Defendants succeeded in concealing the No- Poach Agreement from Plaintiff and the members of the Class. But for the DOJ's criminal investigation of Patel and the resulting publication of the DCIS Affidavit and December 15, Indictment, exposing the No-Poach Agreement, the existence of the anticompetitive No-Poach Agreement might have remained permanently hidden.

14.     Defendants were aware that their conduct was illegal. Indeed, on multiple occasions, managers and executives raised concerns that restricting the hiring of employees as required by the No-Poach Agreement was illegal. But Defendants persisted in the conduct anyway.

15.     Antitrust enforcers in the United States have been clear that this conduct is unlawful, and it has been the subject of increased enforcement activity in recent years. Indeed, the DOJ has brought numerous successful criminal prosecutions seeking to hold those who enter into these types of harmful pacts, criminally liable.

16.     In 2016, the Department of Justice and Federal Trade Commission issued guidance about the anticompetitive effects of no-poach agreements like the one at issue in

this case. The guidance made clear that agreements between employers not to solicit or hire each other's employees "eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct."[1]

17.     In the ensuing years, the DOJ has continued to issue guidance to employers making clear that no-poach agreements remain illegal. For example, in 2019, the DOJ wrote:

> When companies agree not to hire or recruit one another's employees, they are agreeing not to compete for those employees' labor. Robbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment. Under the antitrust laws, the same rules apply when employers compete for talent in labor markets as when they compete to sell goods and services.[2]

18.     The No-Poach Agreement at issue in this case reduced competition for Engineers and, as a result, it reduced Plaintiff's job mobility and enabled Defendants to pay their employees, including members of the Class, less than they would have been paid

---

[1] *See* , Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, Antitrust Guidance for Human Resource Professionals, at 4 (Oct. 2016), https://www.ftc.gov/system/files/documents/public_statements/992623/ftc-doj_hr_guidance_final_10-20-16.pdf (last visited Dec. 25, 2021).

[2] *See* No-Poach Approach, Dep't of Justice Antitrust Div. (Sept. 30, 2019), https://www.justice.gov/atr/division-operations/division-update-spring-2019/no-poach-approach (last visited Dec. 25, 2021).

absent the No-Poach Agreement. The No-Poach Agreement is a *per se* unlawful restraint of trade under the federal antitrust laws and injured Plaintiff and the members of the Class.

19.     Defendants' conspiracy thus has restricted trade and is *per se* unlawful under federal law. Plaintiff seeks injunctive relief and damages for violations of Section One of the Sherman Act, 15 U.S.C. § 1.

## II.     Jurisdiction and Venue.

20.     Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees, arising from Defendants' violations of Section One of the Sherman Act, 15 U.S.C. § 1.

21.     The Court has subject matter jurisdiction pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

22.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and a substantial portion of the affected interstate trade and commerce was carried out in this District.

## III.     The Parties.

### A.     Plaintiff.

23.     Plaintiff Matthew Cydylo is a citizen and resident of the State of Connecticut. Mr. Cydylo was employed as an Engineer for QuEST beginning in April 2014 until July 2016, working on P&W projects. Mr. Cydylo was injured in his business or property by reason of the violation alleged herein.

**B.**     Defendants.

24.     On information and belief, Defendant P&W is identified as Company A in the DCIS Affidavit and December 15 Indictment. P&W is a division of Raytheon Technologies Corporation and is one of the largest aerospace engine design, manufacture, and service companies in the United States. P&W has over 36,000 employees, including thousands of Engineers. P&W relies upon different sources of labor to design, manufacture, and service its aerospace products, including by hiring Engineers directly and through outsource engineering. In an outsource arrangement, an outsource engineering supply company (a *Supplier*) enters into an agreement with P&W to complete a particular project, assigns Engineers from among its own employees to complete that project, and receives an agreed-upon payment from P&W for such work. P&W, thus, competes with the Supplier Defendants to recruit and hire Engineers, while at the same time outsourcing Engineers from the Supplier Defendants.

25.     Defendant QuEST is identified as Company B in the DCIS Affidavit and the December 15 Indictment. QuEST is an Ohio corporation with a principal place of business in East Hartford, Connecticut. QuEST supplies Engineers who worked on projects for P&W and other aerospace firms on an outsource basis. QuEST competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. QuEST also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

26.     Defendant Belcan is identified as Company C in the DCIS Affidavit and the December 15 Indictment. Belcan is an Ohio corporation with a principal place of business in Windsor, Connecticut. Belcan supplies Engineers who work on projects for P&W on an outsource basis. Belcan competes with P&W as well as the other Supplier Defendants to recruit and hire engineers. Belcan also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

27.     Defendant Cyient is identified as Company D in the DCIS Affidavit and the December 15 Indictment. Cyient, formerly known as Infotech Enterprises Limited, is a California corporation with a principal place of business in East Hartford, Connecticut. Cyient supplies Engineers who worked on projects for P&W on an outsource basis.

Cyient competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. Cyient also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

28.     Defendant PSI is identified as Company E in the DCIS Affidavit and the December 15 Indictment. PSI is a Florida corporation with offices in Jupiter, Florida. PSI supplies Engineers who worked on projects for P&W on an outsource basis. PSI competes with P&W as well as the other Supplier Defendants to recruit and hire Engineers. PSI also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

29.     Defendant Agilis is identified as Company F in the DCIS Affidavit and the December 15 Indictment. Agilis is a Florida corporation with a principal place of business in Palm Beach Gardens, Florida. Agilis supplies employees who worked on projects for P&W on an outsource basis. Agilis competes with P&W as well as the other Supplier Defendants to recruit and hire engineers. Agilis also competes with other Supplier Defendants for outsource work from P&W and does so on the basis of, among other things, price.

30.     Defendant Mahesh Patel is a natural person and resident of Connecticut. He worked as Manager and (later) Director of the unit within P&W in charge of

managing the relationships between P&W and its Suppliers. Within that unit, he was the highest-ranking employee, and managed a team of associates from his office in East Hartford, Connecticut. Mr. Patel and his associates frequently communicated with representatives of the Suppliers, controlled the retention, scope of work, and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for P&W. December 15 Indictment, ¶ 10. Mr. Patel was also involved in master contract negotiations between Suppliers and Raytheon, P&W's parent company, which provided for maximum pricing for each Supplier to P&W. *Id.* Mr. Patel left his employment at P&W in March 2020. Mr. Patel participated in, ordered, authorized and assumed a direct role in the illegal conduct alleged. He knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Patel was acting on behalf of P&W while engaged in the company's management, direction, or control, or transaction of its business or affairs. During the relevant period, Mr. Patel participated in the conspiracy and committed overt acts in furtherance thereof.

31.     Defendant Robert Harvey is a natural person and resident of Connecticut. Mr. Harvey has been the President-Global Business Head of QuEST Global since 2019

and is based in East Hartford, Connecticut. Mr. Harvey served as QuEST Global's Senior Vice President from 2010 to 2014. Thereafter, he served as President-Strategic Accounts at QuEST Global from 2014 to 2019. Mr. Harvey knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Harvey was acting on behalf of QuEST Global while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of QuEST Global to maintain and advance his employer's business relationship with P&W, and substantial responsibilities with respect to the management of hiring and recruiting at QuEST Global. Mr. Harvey had communications with Mr. Patel and other co-conspirators on these subjects. On December 15, Mr. Harvey was indicted and charged with one count of violating the Section One of the Sherman Act.

32.     Defendant Harpreet Wasan is a natural person and resident of Connecticut. Mr. Wasan began working at QuEST Global in 2015 as the company's Vice President – AeroEngines/Strategic Client Partner. His job was based in Hartford, Connecticut. Between 2017 and 2019, Mr. Wasan began to serve as QuEST Global's Vice President of the Asia Pacific Region, and was based in Tokyo, Japan. Mr. Wasan left QuEST Global in January 2021. Mr. Wasan knew of and participated in communications with counterparts working on

behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Wasan was acting on behalf of QuEST Global while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of QuEST Global to maintain and advance his employer's business relationship with P&W, and substantial responsibilities with respect to the management of hiring and recruiting at QuEST Global. Mr. Wasan had communications with Mr. Patel and other co-conspirators on these subjects. On December 15, Mr. Wasan was indicted and charged with one count of violating the Section One of the Sherman Act.

33.    Defendant Steve Houghtaling is a natural person and resident of Connecticut. In 2013, he began working for Belcan as a General Manager, and was promoted to Vice President in 2015. Since 2019, he has served as Belcan's Senior Vice President, working primarily from an office in Windsor, Connecticut. Mr. Houghtaling knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Houghtaling was acting on behalf of Belcan while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of Belcan to maintain and advance his employer's business relationship with P&W, and

substantial responsibilities with respect to the management of hiring and recruiting at Belcan. Mr. Houghtaling had communications with Mr. Patel and other co-conspirators on these subjects. On December 15, Mr. Houghtaling was indicted and charged with one count of violating the Section One of the Sherman Act.

34.     Defendant Thomas Edwards is a natural person and resident of Connecticut, and is currently based in New Fairfield, Connecticut. Mr. Edwards was the President of Cyient's North American Operations from 2013-2014, and worked principally from an office in East Hartford, Connecticut. Prior to that, Mr. Edwards served as Cyient's Vice President of Engineering, Aerospace from July 2010 to March 2013. Mr. Edwards knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Edwards was acting on behalf of Cyient while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of Cyient to maintain and advance his employer's business relationship with P&W, and substantial responsibilities with respect to the management of hiring and recruiting at Cyient. Mr. Edwards had communications with Mr. Patel and other co-

15

conspirators on these subjects. On December 15, Mr. Edwards was indicted and charged with one count of violating the Section One of the Sherman Act.

35.      Defendant Gary Prus is a natural person and resident of Florida. He is currently the Chief Operating Officer of PSI. Mr. Prus knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. Prus was acting on behalf of PSI while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial responsibilities on behalf of PSI to maintain and advance his employer's business relationship with P&W, and substantial responsibilities with respect to the management of hiring and recruiting at PSI. Mr. Prus had communications with Mr. Patel and other co-conspirators on these subjects. On December 15, Mr. Prus was indicted and charged with one count of violating the Section One of the Sherman Act.

36.      Defendant Frank O'Neill is a natural person and resident of Florida. He has served as Agilis's President and CEO since 1993. Mr. O'Neill knew of and participated in communications with counterparts working on behalf of other participants in the conspiracy and was aware of others who did so as well. When engaged in the actions set forth in this complaint, Mr. O'Neill was acting on behalf of Agilis while engaged in the company's management, direction, or control, or transaction of its business or affairs. He had substantial

16

responsibilities on behalf of Agilis to maintain and advance his employer's business relationship with P&W, and substantial responsibilities with respect to the management of hiring and recruiting at Agilis. Mr. O'Neill had communications with Mr. Patel and other co-conspirators on these subjects. Mr. O'Neill is the individual identified as "Co-Conspirator 8" in the DCIS Affidavit.

37.     Defendants' actions described herein are part of, and in furtherance of, the unlawful conduct alleged. These actions were authorized, ordered, and/or undertaken by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with Defendants' actual and/or apparent authority.

38.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this complaint and have performed acts and made statements in furtherance of the No-Poach Agreement and other anticompetitive conduct.

39.     When this complaint refers to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity acted by or through its officers, directors, agents, employees, or

17

representatives while they were actively engaged in the management, direction, or of the corporation's or limited liability entity's business.

IV.     **Factual allegations.**

      A.     **Trade and Commerce.**

      40.     During the Class Period (defined Below), Defendants employed members of the Proposed Class in, among other places, Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, Florida, PuertoRico, Kentucky, and throughout the United States, including in this District.

      41.     The No-Poach Agreement has substantially affected interstate commerce and has caused antitrust injury throughout the United States.

      B.     **The Market for Aerospace Engineering Services in the United States.**

      42.     The No-Poach Agreement is *per se* illegal under the federal antitrust laws, and thus, there is no requirement to define the relevant product or geographic markets. As the DOJ made clear in guidance it issued in 2016: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws."[3] But, to the extent a relevant

---

[3] Dep't of Justice Antitrust Div. and Fed. Trade Comm'n, *supra* note 1 at 3.

market need be defined for any reason, it is for the services of aerospace engineers in the United States and its territories.

43.     Aerospace Engineers design primarily aircraft, spacecraft, satellites, and missiles.  As a result, such Engineers may find employment in industries whose workers design or build aircraft, missiles, systems for national defense, or spacecraft, primarily in manufacturing, analysis and design, and research and development.

44.     There were approximately 60,000 aerospace engineers employed in 2020, and about 4,000 openings for aerospace engineers are projected each year, on average, over the decade.

45.     Engineers in the aerospace industry may be employed directly by companies that design and manufacture aircraft, spacecraft, satellites, and missiles ("Aerospace Firms"). They may also be employed by outsource engineering supply companies – Suppliers – who enter agreements with Aerospace Companies to complete a particular project, often referred to as a Statement of Work. When brought on to complete an outsource work project, a Supplier assigns Engineers from among its own employees to complete that project and the Supplier collects an agreed-upon payment from the given Aerospace Firm.

46.     In this labor market for aerospace engineering services, Aerospace Firms and Suppliers, including Defendants, are buyers, and Engineers, including Plaintiff and the members of the Class, are sellers. In short, Aerospace Firms and Suppliers pay compensation to Engineers for the Engineers' services.

47.     Defendants compete with one another to recruit and hire Engineers.

48.     Suppliers compete with one another for outsource work projects from Aerospace Firms, including on the basis of price. Labor costs for the Engineers employed by Suppliers form one of the largest parts of the ultimate price that is quoted to Aerospace Firms.

49.     Engineers have highly specialized skills. Engineers graduate from undergraduate and/or graduate engineering programs with engineering degrees—often specific to aerospace engineering. Once in the workforce, Engineers further specialize based on the work they do, including specializing in a category (*e.g.*, software/systems engineers, mechanical engineers, structural analysts), and within those categories, specific to particular functions (*e.g.*, specializing in aerodynamic fluid flow; structural design; guidance, navigation and control; instrumentation and communication; and propulsion and combustion). The aerospace application of these categories and functions is

particular to aerospace engineering services and not directly transferable to other engineering fields.

50.     Because of the significant training and experience required to perform aerospace engineering services, Engineers would not turn to other engineering employment opportunities if a hypothetical monopsonist imposed a small but significant non-transitory decrease in compensation.

51.     Furthermore, as set forth herein, as Engineers become further specialized, their skills both increase in value due to the scarcity of experienced aerospace engineers in each specialty and increase in particular value to firms working on projects that Engineers' specializations are focused on.

52.     The relevant geographic market for the relevant market is the United States and its territories.

53.     Engineers in the United States and its territories do not see aerospace engineering jobs abroad as a reasonable substitute for aerospace engineering jobs in the United States and its territories. Such foreign positions are less desirable for numerous reasons, including, without limitation, language barriers, visa requirements, significant costs associated with moving abroad, and the significant distances such moves would create between the Engineers and family members. Although foreign Engineers have

immigrated to the United States to participate in the relevant market, on information and belief, Engineers in the United States do not frequently take positions in the relevant market outside of the United States.

### C.   Defendants have Market Power in the Relevant Market.

54.   Defendants have the ability, collectively, to profitably suppress compensation to Engineers. That is, Defendants can impose a small but significant decrease in pay or compensation without losing sufficient numbers of Engineers to defeat the effects of the pay decrease. Likewise, Defendants can maintain pay below a competitive level without losing sufficient numbers of Engineers to defeat the effects of the pay decrease.

55.   Thus, Defendants' demonstrated ability to profitably suppress compensation is evidence of Defendants' collective market power in the relevant market described above.

### D.   Competition for Engineers in the Absence of a No-Poach Agreement.

56.   In a properly functioning and lawfully competitive labor market, and but for the unlawful No-Poach Agreement, Defendants would aggressively compete for Engineers by recruiting and hiring from each other. Because experienced Engineers are critical to Defendants' ability to compete for and complete projects, in the absence of the

No-Poach Agreement, Defendants would compete with each other for the services of skilled Engineers.

57.     Active lateral recruiting is important in properly functioning labor markets, in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than candidates who are unemployed or actively seeking employment outside their current jobs. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee.

58.     Competition for Engineers via recruiting and lateral hiring has a significant impact on Engineers' mobility and compensation in several ways.

59.     First, when companies employing Engineers become aware of attractive outside opportunities for their Engineers, the threat of losing these employees to a competitor encourages an employer to preemptively increase compensation to increase morale and competitive positioning and ultimately to retain valuable labor. If certain employers do not react to competition, their Engineers may be receptive to recruiting by a rival employer or seek positions that offer more generous compensation and benefits elsewhere.

60.     Once an Engineer has received an offer from a rival employer, retaining that employee may require a disruptive increase in compensation for one individual. Increasing information and compensation for one person will have more widespread salary effects across a company and market. One such mechanism for this widespread effect is salary discovery, in which information about competing salaries causes higher compensation even among those employees not actively looking to switch employers. Another such mechanism is "internal equity" within organizations, where employers endeavor to maintain parity in pay levels across employees within the same categories, as well as maintain certain compensation relationships among employees across different job categories.

61.     In a market untainted by their anticompetitive coordination, Defendants would have had an incentive to preempt lateral departures by paying their Engineers well enough that they would become less likely to seek or pursue outside opportunities. Preemptive retention measures would therefore have led to increased compensation for all Engineers.

62.     Second, the availability of desirable positions at competing employers forces employers to increase compensation to retain Engineers who are likely to join a competitor. This can occur both when a particular Engineer or group of Engineers

becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its Engineers by increasing compensation levels. In the former scenario, even a targeted increase designed to retain specific Engineers will put upward pressure on the entire organization's compensation structure.

63.     The positive compensation effects of hiring Engineers from competitors are not limited to the particular individuals who seek new employment or to the particular individuals who would have pursued new positions but for a No-Poach Agreement. Instead, the effects of a restraint in the labor market as a result of a No-Poach Agreement (and the effects of suppressing recruiting and hiring pursuant to a No-Poach Agreement) commonly impact all individuals in positions subject to the restraint.

64.     Conversely, suppression of competition for cross-hiring and recruitment serves as a drag on compensation that permeates throughout an organization. Here, the No-Poach Agreement enabled Defendants to target the impact of their coordination on the employees most likely to command disruptive increases that, through processes of internal equity and salary discovery, would have led to increases that would have benefited all their employees.

65.     Thus, while Defendants obtain significant advantages by engaging in lateral hiring among them, the competition also inflicts a cost on the other Defendant by taking away a valuable employee and raising pay for Engineers across the companies. Consequently, by agreeing not to compete, Defendants were able to minimize these costs to the detriment of Plaintiff and members of the proposed Class.

### E.     The No-Poach Agreement.

66.     Beginning at least as early as 2011 and continuing until as late as September 2019, Defendants, through their officers, directors, agents, employees, or representatives, agreed not to compete for each other's Engineers in the aerospace industry working on projects for P&W, specifically by agreeing to restrict the hiring and recruiting of Engineers between and among Suppliers in the United States.

67.     P&W served as a leader and primary enforcer of the No-Poach Agreement and did so through defendant Mahesh Patel – a manager and later the director of the unit within P&W in charge of managing relationships with Suppliers.

68.     The No-Poach Agreement manifested itself in interwoven and overlapping hiring and recruiting restrictions, all of which had the common purpose of limiting competition for, and thereby restricting the free movement of, Engineers within the aerospace engineering industry. The No-Poach Agreement thus artificially extended Engineers' length of work at a given employer and reduced or eliminated their ability to

advocate and obtain better terms of employment, including compensation, at current and future employers.

69.     The hiring and recruiting restrictions that make up the No-Poach Agreement were shaped by Defendants' shared financial motivations, specifically a desire to suppress wages and thereby lessen labor costs.

70.     Certain of the recruiting and hiring restrictions that make up the No-Poach Agreement are outlined below.

### 1.     Restricting hiring and recruiting between Suppliers.

71.     As part of and to effectuate the No-Poach Agreement, the Supplier Defendants – through their officers, directors, agents, employees, or representatives – agreed not to recruit and hire one another's Engineers, and P&W – through defendant Patel – acted as a leader and chief enforcer of this restriction on recruiting and hiring. P&W's enforcement of this agreement was effective, in part, due to P&W's position as the Suppliers' common customer.

72.      Beginning as early as 2011, certain Suppliers who provided Engineers to P&W entered into agreements that they would restrict the hiring and recruiting of Engineers between and among them.

73.     P&W's involvement in this anticompetitive scheme began at around or about the same time period, with Patel taking an active role in the conspiracy.

27

a. **Defendants instructed one another to adhere to the restrictions onrecruiting and hiring and expressly tied this to the goal of compensation suppression.**

74.     Patel instructed managers and executives at Suppliers that P&W's Suppliers should not be recruiting and hiring one another's Engineers.

75.     The Suppliers understood that these restrictions applied mutually among the Suppliers themselves.

76.     Patel made these communications with each of the Suppliers directly, communicating the restriction and that other Suppliers were observing it as well.

77.     For example, in 2016, Patel emailed the Chief Operating Officer, Executive Vice President and part owner of PSI. He stated: "Last time we talked you assured me that you will not hire any [P&W] partners employee [sic]. This must stop, otherwise others will also start poaching your employees." DCIS Affidavit, ¶ 29.

78.     Patel also discussed these restrictions on Suppliers' recruiting and hiring when multiple Suppliers were present.

79.     For example, in December 2015, P&W hosted a dinner that was attended by Patel and representatives from Suppliers for P&W, including QuEST, Belcan, and Cyient. December 15 Indictment, ¶ 22(a). These representatives included individuals at senior and powerful levels of these companies, such as the President of the North America Operations for Cyient, the Vice President/Strategic Client Partner for QuEST,

28

and a General Manager for QuEST. Patel addressed the Supplier representatives at the dinner, during which he instructed the attendees that there should be no poaching of one another's Engineers.

80.     These instructions were subsequently shared with others at the Supplier companies. For example, following the meeting, an executive of Belcan, who was in attendance at the dinner, sent an email to defendant Houghtaling and other Belcan employees, summarizing Patel's remarks: "Mahesh did take the stage at the end . . . no poaching of each others' [sic] employees." December 15 Indictment, ¶ 22(a).

81.     Suppliers also communicated directly with one another to confirm their agreement with and mutual adherence to the restrictions on recruiting and hiring.

82.     For example, in a September 2019, after Agilis had hired four Cyient employees, the President for Cyient's North America Operations reached out to the Founder, President, and Chief Executive Officer of Agilis, and asked him to stop "actively recruiting" Cyient's employees. DCIS Affidavit, ¶ 34. Agilis' CEO agreed, telling Cyient's President of North America Operationsthat Agilis' "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." *Id.* In response, Cyient's head of North America Operations

thanked Agilis' CEO and noted "I flat out ask our teams not to hire people from the other [P&W] suppliers." *Id.*

83.     The Defendants also effectuated their agreement by rescinding offers of employment that violated the conspiracy. DOJ Indictment, ¶ 26. For example, in June 2018, there were emails and conversations between defendant Patel and individuals from Belcan, including defendant Houghtaling, discussing Belcan's employment offer to an engineer at QuEST. *Id.* The discussion concluded with a Belcan executive telling Patel "[p]er our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the engineer being discussed. *Id.*

### b.  Defendants had a common interest in suppressing labor costs.

84.     Throughout the operations of the Suppliers' restrictions on recruiting and hiring, representatives from Defendants justified these actions by appealing to their effects in suppressing wages for Engineers and the benefits this would accrue to Defendants. The Defendants and their co-conspirators often encouraged each other to comply with the agreement by pointing to the mutual financial benefits of the agreement, which included preventing wages and labor costs from rising.

85.     This reasoning was articulated in communications between Patel and representatives of the Suppliers, as well as between representatives of the Suppliers directly.

86.      For example, in January 2017, after chastising Prus for PSI's hiring making an employment offer to an employee of Cyient, Patel contacted another representative of PSI and instructed: "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." December 15 Indictment, ¶ 27(b); DCIS Affidavit, ¶ 24.

87.     That January 2017 email was subsequently shared with Chief Operating Officer, Executive Vice President and part owner of PSI. And in March of 2017, that individual discussed P&W's hiring restrictions with an executive of another Supplier, noting that "MAHESH says he does not want the salaries to increase." DCIS Affidavit, ¶ 24.

88.     Likewise, in April of 2017, a General Manager from QuEST sent an email warning that Cyient had hired an Engineer who was employed with QuEST, noting that "[t]his is against our agreements with our employees and against our known expectations of [P&W] for the cooperation of the outsource companies" and complaining that if such hiring does not stop, it will "drive the price structure up." December 15 Indictment, ¶

27(c); DCIS Affidavit, ¶ 25. Defendant Patel subsequently reached out to the executives of the two Suppliers involved – the General Manager from QuEST and the President of North America Operations from Cyient – and marked them as "required" attendees on an invitation for a "private discussion" in his office the next day. DCIS Affidavit, ¶ 25; December 15 Indictment, ¶ 29(g).

89.     As another example, In September 2019, after learning that Agilis hired employees from Cyient, defendant Edwards emailed the CEO of Agilis to request adherence to the hiring and recruiting restrictions. December 15 Indictment, ¶ 27(a). In the email, Edwards stated, "I wanted to ask if your team could refrain from actively recruiting our [Cyient] employees going forward." *Id.* Edwards further assured the Agilis CEO, "I flat out ask our teams not to hire people from the other [P&W] suppliers." *Id.* The Agilis CEO assured Edwards, "[o]ur general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get [sic] unstable, and our margins all get hurt." *Id.*

### c.   The Defendants policed and enforced the No-Poach Agreement.

90.     The Defendants and their co-conspirators monitored and enforced compliance with their illegal agreement by among other means: 1) investigating whether employees were seeking employment with or had been offered employment by another co-

conspirator; 2) alerting co-conspirators, through direct communications in which Patel

served as an intermediary, to instances in which those co-conspirators hired and recruited

in a manner that violated the agreement; 3) with respect to Patel, threatening to reduce,

withhold, and disrupt business transactions between P&W and its co-conspirator

companies if they did not conform to the agreement, including by withholding or

withdrawing P&W statements of work and purchase orders; and 4) demanding through

direct communications and communications in which Patel served as an intermediary,

that co-conspirator cease hiring and recruiting in a manner that violated the agreement.

December 15 Indictment, ¶ 28.

91.    P&W, through defendant Patel, repeatedly acted as an intermediary

between the Supplier Defendants to police and enforce the agreement restricting their

recruiting and hiring, including by directly reprimanding Suppliers who attempted to

solicit or hire other Suppliers' employees in violation of the agreement.

92.    Patel often acted in response to requests from Suppliers, who would alert

Patel to infractions of the agreement and ask that he assist in preventing or deterring such

violations.

93.    For example, in February 2015, after Cyient hired an employee of QuEST,

defendant Edwards emailed another Cyient executive, stating, "I let Mahesh know this

happened-[a]nd we are still looking into how exactly this happened." December 15 Indictment, ¶ 25(b). And, Edwards continued, "can you let Mahesh know the actions we're taking to prevent this from happening again?" *Id.*

94.      As another example, in May 2016, defendant Houghtaling was informed by a colleague that "[a]nother employee" had been hired by PSI to work on an outsourcing project for a company other than P&W. December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27. The colleague asked Houghtaling if he "ever discuss[ed] the last one with Mahesh." December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27. Houghtaling assured the colleague that he had spoken to Patel and that Patel "said he'd talk to PSI about it." December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27. Houghtaling subsequently emailed defendant Patel to complain that his company was "losing another employee to PSI," and named the employee. December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27.

95.      In September 2016, a Belcan executive alerted Patel to a recent poaching by PSI. December 15 Indictment, ¶ 28(e). An email from Patel to defendant Prus followed in which Patel stated, "[y]ou had assured me that PSI will never soliciting [sic] P&W's long term partners [sic] employees ... Please send me in writing that proper steps has [sic] taken place to curtail this practice." December 15 Indictment, ¶ 28(e). In

response to Patel's reprimand, Prus instructed a PSI employee by email to "[p]lease stop speaking to any Belcan or other P&W supplier companies about transitioning to a PSI Office immediately." December 15 Indictment, ¶ 28(e).

96.     A few months later, a similar communication occurred in the opposite direction. In November 2016, defendant Prus emailed Patel complaining about Belcan "actively Recruiting PSI employees." December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27.  Patel forwarded Prus's email to defendant Houghtaling and another Belcan manager, saying, "[w]e must not poach each other partners employee. Please communicate to Belcan HR not to interview or hire active employees working on P&W work." December 15 Indictment, ¶ 22(c); DCIS Affidavit, ¶ 27. In another November 2016 email, Prus wrote to another executive at PSI, "[n]eed to have a conversation with [a Belcan manager] about them actively recruiting PSI employees. We do not EVER call their employees." December 15 Indictment, ¶ 28(g). Later that day, the PSI executive responded to Prus, "I talked to him. He will talk to recruiting . . . ." *Id.*

97.     As another example, in a February 2017 email, defendant Wasan responded to the news that Belcan had made an employment offer to a QuEST engineer by stating: "Belcan is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." December 15 Indictment, ¶ 22(b).

Approximately four minutes later, defendant Wasan forwarded the information about Belcan's offer directly to defendant Patel, adding, "I am very concerned that [Belcan] believes they can hire any of our employees. .... Could you please stop this person from being hired by Belcan?" December 15 Indictment, ¶ 22(b); DCIS Affidavit, ¶ 28. Managing communications with Patel upon learning of other Suppliers' violations of the agreement were a specific responsibility of Wasan. DCIS Affidavit, ¶ 28.

98.     Further, in January 2017, a representative from Cyient emailed Patel to inform him that PSI had hired a Cyient Engineer and Patel forwarded this email to defendant Prus. Patel wrote: December 15 Indictment, ¶ 25(b); DCIS Affidavit, ¶ 29. "Last time we talked you assured me that you willnot hire any [P&W] partners employee. This must stop, otherwise others will also start poaching your employees. Please advise." December 15 Indictment, ¶ 25(b); DCIS Affidavit, ¶ 29. Defendant Prus subsequently forwarded the email to a PSI recruiting employee and said, "[p]lease make sure we stay away from Belcan, Cyient, Agilis personnel moving forward." December 15 Indictment, ¶ 25(b).

99.     In December 2017, a V.P. from QuEST emailed defendant Houghtaling complaining about Belcan's reported employment offers to two QuEST employees in Illinois and stated, "I would like to understand if you are planning to address this

immediately, or I will be forced to escalate to our mutual customers." December 15 Indictment, ¶ 28(f). Defendant Harvey responded, "[s]pot on. This cannot be tolerated! We need to move quickly and forcibly when this is about to happen." *Id.* Later, he added, speaking to QuEST's management and executive team: "[p]ush hard to have it reversed and consequences for Belcan." *Id.*

100.    Patel's enforcement of the agreement on behalf of the Suppliers was effective in ensuring that the Suppliers adhered to the terms of the agreement.

101.    For example, after a Belcan executive notified Patel that PSI was recruiting and hiring Engineers in violation of the agreement, Patel sent an email to the Executive Vice President and part owner of PSI. Referencing Belcan, Patel wrote: "You had assured me that [PSI] will never soliciting [P&W's] long term partners employees . . . Please send me in writingthat proper steps has taken place to curtail this practice." *Id.* ¶ 31. In a later email, the ExecutiveVice President and part owner of PSI indicated that he understood Belcan was the source of this complaint, writing that Belcan "is making a big stink right now over any solicitations." *Id.* The Executive Vice President and part owner of PSI subsequently instructed another employee of PSI to "[p]lease stop speaking to any [Belcan] or other [P&W] supplier companies about transitioning to [a PSI] Office immediately." *Id.*

102.    P&W also exercised its authority as a customer of the Suppliers in order to ensure they followed the prohibition from recruiting and hiring one another's Engineers.

103.    As an example, in June 2018, Patel reached out to executives from Belcan concerning a recent effort to hire an Engineer at QuEST. Patel had learned of these plans from individuals at QuEST. A recruiter at Belcan explained in an internal email, eventually forwarded to Belcan managers and executives, that QuEST "complained to [P&W] that we are 'stealing' their people, and [P&W] threatened to pull all POs from [Belcan] if we hire him." *Id.* ¶ 33. A day later, a Belcan employee emailed Patel and said: "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" the Engineer at issue. *Id.*

### d.  P&W enforced the No-Poach Agreement despite warnings that this conduct was unlawful.

104.    At least as early as January 2016, well before several of the examples of unlawful conduct described herein, certain managers and executives at Belcan began raising concerns with Patel that the conduct of P&W and the Suppliers was unlawful, specifically because they violated the antitrust laws.

105.    Early in January 2016, a General Manager for Belcan received an email describing a civil lawsuit in which several major companies were accused of (as the Belcan

38

employee forwarding the email put it) "engaging in illegal anti-poaching agreements......the companies involved had promised each other not to actively recruit employees from one another." *Id.* ¶ 35. The General Manager subsequently planned a meeting with Patel in which one of the items for discussion was "[i]nformal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal" (an apparent reference to the 2015 settlement in *In re High-Tech Employee Antitrust Litigation*, No. 5:11-cv-2509 (N.D. Cal.)). *Id.* ¶36.

106.    The same General Manager raised the unlawful nature of the restrictions on recruiting and hiring with Patel again in February 2017. In a series of emails, Belcan's Human Resources Director and the General Manager discussed an upcoming call with Patel, which was planned concerning a recent allegation that Belcan had hired an Engineer from QuEST in violation of the No-Poach Agreement. The HR Director noted her concern that "there is an anti-trust issue by us turning people away solely based on their previous employer." DCIS Affidavit, ¶ 37. The General Manager acknowledged these concerns about illegality in a subsequent email to the HR Director, noting "[P&W] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors . . . I'm not sure if this is legal, but that is what they are requesting we do." DCIS Affidavit, ¶ 37. The next day, Belcan's HR Director reported that she and

another Belcan manager "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Belcan] competitors." DCIS Affidavit, ¶ 37. Two weeks later, one of the individuals who was included on these email threads sent an email to the Belcan HR Director, the General Manager, and the Vice President of Human Resources. The sole content of the email was a link to a website that described a class action antitrust lawsuit concerning a "conspiracy" between companies who had agreed to "restrict[] recruiting of each other's employees." DCIS Affidavit, ¶ 38.

### 2.     Restricting Hiring and Recruiting Between P&W and QuEST.

107.    As part of and to effectuate the No-Poach Agreement, P&W and QuEST agreed to restrict P&W's hiring and recruiting of Engineers from QuEST. P&W and QuEST did so through two primary means: 1) setting a two-year tenure restriction for any QuEST Engineers hired by P&W, and 2) instituting periodic hiring freezes, in which P&W would not make any hires of QuEST Engineers.

### a.   The Two-Year Tenure Restriction.

108.    In 2011, a QuEST executive – who has served as Senior Vice President, President-Strategic Accounts, and President-Global Business Head during his time at QuEST–began pushing Patel to enter an agreement in which P&W would wait to hire QuEST's employees until they had worked at QuEST for a specified length of time.

109.    In September of that year, defendant Harvey, along with a QuEST account manager, attended a dinner with Patel and a P&W Vice President to whom Patel directly reported. December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 42. The objectives of the dinner included a discussion of the QuEST executive's proposal concerning tenure. December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 42.

110.    The day following that dinner, defendant Harvey sent an email to the attendees, stating: "We truly appreciate and value our strategic relationship....I thought I would take the lead in summarizing what we discussed last night and proposed next steps..." December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 42. The first item on the list was "Personnel Transfers" (in quotations in the original email). December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 42. Defendant Harvey described this as "the new policy/guidelines" that the P&W Vice President had reviewed at the dinner, which set a "min. 24 months" period for such "Personnel Transfers." December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 42. Harvey further indicated that Patel had advised that he limit the written record on this agreement, noting that, "[f]ollowing Mahesh's previous counsel, [he would] not go[] into detail in writing on this subject." DCIS Affidavit, ¶ 42.

111.    Subsequently, starting in late 2011, managers and executives from QuEST (including defendants Harvey an Wasan) would routinely communicate with Patel and

others in his outsourcing management group at P&W concerning this agreement. December 15 Indictment, ¶ 24(a); DCIS Affidavit, ¶ 43. Specifically, these managers and executives worked to reconfirm, maintain, and enforce this agreement and to block or attempt to block P&W's recruiting and hiring of those QuEST employees covered by the agreement. DCIS Affidavit, ¶ 43.

112.    For example, in October 2012, one QuEST employee wrote to Patel concerning an employee about whom Patel had inquired, stating: "[Employee's] tenure at [QuEST] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [P&W] not pursue employment of [him] at this time." DCIS Affidavit, ¶ 44.

113.    Similarly, in June 2015, Patel emailed managers from QuEST, stating that P&W "is interested in interviewing and hiring" two QuEST Engineers and asking that QuEST "[p]lease provide your concurrence." DCIS Affidavit, ¶ 45. One of the QuEST managers responded that, while one of the Engineers had worked at QuEST for four and a half years and "meets requirements," the other "only has 8 months and does not meet obligation, so [QuEST] cannot provide concurrence." *Id.*

114.    As another example, in April 2017, two QuEST managers, discussing a P&W request to hire a certain QuEST Engineer, noted in an internal email that this

employee "wouldn't meet our requirements for two years." DCIS Affidavit, ¶ 46;

December 15 Indictment, ¶ 24(b). Two days later, one of those managers emailed Patel to

inform him that the employee "does not meet tenure requirements." DCIS Affidavit, ¶

46; December 15 Indictment, ¶ 24(b). Patel in turn told a P&W HR employee: "QuEST

Will not release him . . . He has not completed 2 [y]ears as our verbal agreements." DCIS

Affidavit, ¶ 46; December 15 Indictment, ¶ 24(b).

### b. The Hiring Freezes.

115.    In furtherance of the conspiracy, representatives of QuEST and Patel also

agreed upon periodic freezes of P&W's recruiting and hiring of any QuEST employees,

with limited exceptions.

116.    These hiring freezes took place from approximately 2015 through 2017

and ranged from several months to nearly an entire year in 2016. Each began when

QuEST managers and executives petitioned Patel to limit or stop hiring from QuEST.

117.    For example, in September 2015, following a request by Patel for QuEST's

"concurrence" in P&W's hiring of two QuEST Engineers, one of the QuEST executives

responded with a lengthy complaint concerning the frequency of P&W's hiring of

Engineers from QuEST. The QuEST executive noted that, while both of the employees

in question "have at least two years [QuEST] experience, so [they] meet the 'handshake

agreement' level," he stated:"[QuEST] will not be able to concur with any more hiring of

[QuEST] employees this year. . . .  All we can do is highlight the problem and ask that

[P&W] support us going forward to prevent further hiring of our resources." DCIS

Affidavit, ¶ 48. Another QuEST executive responded to this email and added, addressing

Patel directly, "Mahesh, we truly need your help in blocking these two hires and putting a

moratorium on [QuEST] hires for the remainder of the year." DCIS Affidavit, ¶ 48.

118.     In a further example, in January 2016, Wasan reported to QuEST's Chief

Engineer/Account Manager and another colleague that "I am planning to meet with

Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I

am going to tell him that he needs to block" two QuEST Engineers "from being hired

until we come to an agreement on the acceptable limit to hire [from] our team."

December 15 Indictment, ¶ 23(a); DCIS Affidavit, ¶ 49. On information and belief, this

meeting led to Patel and the QuEST executives establishing a new hiring freeze for 2016.

119.     In or around July 2016, Wasan sent an email to Patel regarding a QuEST

employee that P&W was interested in hiring, writing "we cannot lose him" and

complaining to Patel that "P&W keeps poaching this team." December 15 Indictment, ¶

23(b). Patel then emailed a P&W hiring contact and explained: "I checked with QuEST,

They absolutely <u>do not want to release</u> [the employee]. Please <u>do not extend offer</u> to him.

P&W has committed to QuEST that we will not hire any more of their employees this

year in 2016." December 15 Indictment, ¶ 23(b). Patel then sent the email to Wasan, and Wasan thanked Patel. *Id.*

120.    After reaching agreement with QuEST executives, Patel would announce the beginning of hiring freezes to P&W personnel involved in recruiting and hiring Engineers for P&W and instruct that these freezes be respected. As an example, in early 2017, Patel emailed the Vice President of HR-Engineering for P&W and requested that she "direct your HR team notto hire [QuEST] outsource resources currently deployed on [P&W] projects till end of this year. . . . [QuEST] senior leadership including CEO has repeatedly raised concerns on [P&W] hiring [QuEST] employees. We will lift [QuEST] hiring restriction from Jan 1, 2018." *Id.* ¶ 50.

### c.  P&W and QuEST share a common interest in suppressing labor costs.

121.    The agreement between P&W and QuEST to limit the recruiting and hiring of QuEST Engineers served the common interest of both Defendants by alleviating upward pressure on labor costs to both companies. Specifically, by agreeing to restrict P&W's recruiting and hiring from QuEST, QuEST was able to keep its labor costs down and likewise maintain the low prices that it offered to P&W for its outsourcing projects. Were QuEST to contend with the higher wages and recruiting for Engineers offered by P&W absent the agreement, QuEST would face increased pressure to compete with

P&W on wages, benefits, and professional opportunities and an ensuing need to hike prices for its P&W projects.

122.    Representatives from QuEST explicitly called out the shared benefits to the limitations on recruiting and hiring in their efforts to push P&W to agree to hiring freezes. Specifically, QuEST appealed to the financial benefits that would accrue to both QuEST and P&W if P&W ceased recruiting and hiring QuEST Engineers, including by resisting wage increases.

123.    For example, in June 2017, defendant Harvey from QuEST forwarded a business proposal to an executive at P&W, which was shared with Patel, and noted that this proposal provided "a partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Raytheon, P&W's parent company. December 15 Indictment, ¶ 27(d); DCIS Affidavit, ¶ 52. The attached presentation explicitly promoted and proposed further hiring restrictions for P&W of QuEST Engineers, noting that "[w]e have found that customer hiring of our resources puts pressure on [QuEST's] and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time." December 15 Indictment, ¶ 27(d); DCIS Affidavit, ¶ 52.

**F.      The Structure of the Market for Aerospace Engineers.**

124.      In addition to the extensive direct evidence of the No-Poach Agreement set out above, the market for aerospace Engineers is characterized by plus factors that render the industry susceptible to collusion and bolster the plausibility of the No-Poach Agreement alleged herein. These include: (1) numerous opportunities to collude; (2) high entry barriers for Aerospace Firms and Suppliers; (3) high exit barriers for Engineers; and (4) inelastic demand for and a lack of substitutes for aerospace Engineers.

125.      First, P&W worked closely with the Defendant Suppliers in connection with the outsourcing project work, which gave rise to multiple opportunities for collusion.

126.      P&W maintained long standing working relationships with the Supplier Defendants in this case.

127.      P&W executives like Patel visited Suppliers' offices with regularity.

128.      P&W also regularly monitored and communicated with Defendants about their overall success as Suppliers, including their productivity and ability to offer cost savings to P&W.

129.      As part of this effort, P&W issued awards that it presented to its most valued Suppliers, recognizing accomplishments in areas such as innovation and

productivity. The Defendant Suppliers were frequent recipients of these awards, and Patel was directly involved inthe presentations of these awards to the Suppliers.

130.    For example, in 2017, Belcan received the P&W Supplier Productivity Innovation Award. Belcan issued a press release in connection with this award, noting that this was the sixth award that Belcan received from P&W since 2010 and that the award was a testament to Belcan's highly valued contributions to P&W's success and the two companies' "enduring relationship." Patel spoke at the award ceremony and lauded "Belcan's commitment to driving change and continuously delivering better solutions to [P&W] through value added innovations . . . while allowing [P&W] to maintain its competitive edge in the marketplace."



Executives of Belcan and P&W, including Mahesh Patel, at the 2017 awards ceremony.

131.     As another example, P&W awarded Cyient with two Supplier awards for

2019.  Cyient won the Supplier Innovation Award for the seventh consecutive year and

the Supplier Highest Productivity Award for the fourth year in a row. Cyient issued a

press release announcing these awards and noted that they "recognized Cyient's

continued commitment to delivering unparalleled productivity and cost savings"

including "multi-million dollars in costsavings that were realized through several supplier

saving proposals."



Executives of Belcan and P&W, including Mahesh Patel, at the 2019 awards ceremony

132.     Second, the market for aerospace Engineers is characterized by high entry

barriers for employers. For Aerospace Firms to compete, they must develop desirable and

proprietary products and technologies that commercial and governmental entities are

willing to purchase. Without those products, Aerospace Firms have no need for

Engineers' labor. Without their own products, Suppliers make up the rest of the market

for purchasing Engineers' services. Suppliers likewise have high entry barriers, including, without limitation difficulties in establishing industry trust (of Aerospace Companies) and recognition, as well as difficulties in recruiting and retaining Engineers with requisite expertise.

133.    Third, there are high exit barriers for Engineers. To enter the market, Engineers make substantial investments of time and money in the education, training, and experience that is required to obtain the highly specialized skills necessary to perform this work. Engineers graduate from undergraduate and/or graduate engineering programs with engineering degrees—often specific to aerospace engineering. Once in the workforce, Engineers further specialize based on the work they do, including specializing in a category (*e.g.*, software/systems engineers, mechanical engineers, structural analysts), and within those categories, specific to particular functions (*e.g.*, specializing in aerodynamic fluid flow; structural design; guidance, navigation and control; instrumentation and communication; propulsion and combustion). The aerospace application of these categories and functions is particular to aerospace engineering services and not directly transferable to other engineering fields.

134.    Fourth, demand for aerospace Engineers is relatively inelastic. Over the past decade, about 4,000 openings for aerospace engineers have been projected each year.

As described above, aerospace Engineers have obtained highly specialized skills that are required to perform work in the industry and their services generally cannot be substituted by Engineers from different industries.

### G. Anticompetitive effects and injury suffered by Class Members from Defendants' illegal conspiracy.

135.   The No-Poach Agreement challenged herein has impaired Engineers' mobility and suppressed their compensation below competitive levels.

136.   This anticompetitive agreement to impair Engineers' mobility and suppress their compensation included restrictions on recruiting and hiring among the Supplier Defendants and P&W. This has had significant anticompetitive effects with no countervailing procompetitive benefits.

137.   The No-Poach Agreement suppresses wages for Engineers by restricting the availability of attractive outside opportunities for their Engineers. In a competitive market, the threat of losing employees to a competitor would encourage Defendants to raise wages – either preemptively, in response to direct offers from rival employers, or as a reactive response to retain employees (whether specific or general) – in order to increase morale and competitive positioning and ultimately to retain valuable labor. Such competition is absent due to the No-Poach Agreement.

138.    The positive compensation effects of hiring Engineers from competitors are not limited to the particular individuals who seek new employment or to the particular individuals who would have pursued new positions but for the No-Poach Agreement. Instead, the effects of a "no-poach" restraint in the labor market (and, in particular the effects of suppressing recruiting and hiring pursuant to the No-Poach Agreement here) commonly impact all individuals in positions subject to the restraint.

139.    In accord with economic theory and the above allegations, the No-Poach Agreement here artificially reduced the compensation of all Engineers below levels that would have prevailed in its absence.

140.    Plaintiff and all other members of the Class were harmed by the No-Poach Agreement alleged herein. Defendants' unlawful No-Poach Agreements restrained competition in the market for aerospace engineering services, which had the (intended) effect of suppressing compensation and mobility for all members of the Class. Thus, Plaintiff and the members of the Class suffered antitrust injury.

141.    Without this class action, Plaintiff and the Class will remain unable to receive compensation for the harm they suffered, and Defendants will continue to reap the benefits of their illegal conspiracy.

142.    The unlawful No-Poach Agreement entered into by Defendants is a *per se*
illegal restraint on competition entered into by horizontal competitors in the market for
aerospace engineering services.

143.    In the alternative, Defendants are liable under a "quick look" analysis
where someone with even a rudimentary understanding of economics could conclude
that the arrangement and agreement alleged would have an anticompetitive effect on
Class members and markets.

144.    In the alternative, Defendants are liable under a Rule of Reason analysis
because their unlawful agreements not to hire one another's Engineers reduced
compensation and restrained mobility and competition in the market for Engineers'
services. The unlawful No-Poach Agreement between Defendants had no procompetitive
effects and were not intended to have procompetitive effects. In fact, the No-Poach
Agreement had the explicit intent to suppress compensation to Engineers and was
successful in effectuating that intent. Such unlawful agreement had additional
anticompetitive effects, including, *inter alia*, eliminating competition for skilled labor,
preventing Plaintiff and members of the Class from obtaining employment and earning
compensation in a competitive market, and preventing or limiting employment

opportunities and choice with respect to such opportunities. Such anticompetitive effects outweigh any conceivable procompetitive benefits of the conspiracy.

### H.   Defendants concealed the No Poach Agreements from the public and the Proposed Class.

145.   Defendants actively concealed their illegal No-Poach Agreement from the public and the proposed Class. Defendants did not disclose the existence of the No-Poach Agreement to their Engineers or to the public. As further alleged above, however, Defendants would monitor and enforce each other's compliance with the No-Poach Agreement.

146.   The nature of the No-Poach Agreement ensures it would remain largely undetected by Engineers and the public. Defendants entered into the No-Poach Agreement orally (the existence of which various emails confirm), affirmatively avoiding memorializing the No-Poach Agreement in a written agreement despite its broad application and multi-year duration, opting instead to inform new executives about the No-Poach Agreement's existence on a primarily oral basis. The reason for this practice was to avoid alerting the public and the proposed Class of the No-Poach Agreement's existence and, thus, to deter potential investigations, litigation, and to perpetuate the Agreement's illegal effects.

147.    The Defendants took affirmative steps to conceal the existence and operation of the conspiracy. December 15 Indictment, ¶ 29. Among other things, the Defendants agreed that their conspiracy remain an unwritten understanding and not reflected in master terms agreements or other formal written agreements between P&W and co-conspirators. December 15 Indictment, ¶ 29. Further, with respect to defendant Wasan and other Defendants, they often provided false and misleading information to Engineers and other skilled-labor workers regarding the existence of the agreement and the worker's ability to obtain employment at other co-conspirator companies, including by communicating that employment at other co-conspirator companies was unavailable to them because of noncompete agreements rather than the conspiratorial agreement. *Id.*

148.    For example, in a September 2011 email from defendant Harvey to Patel and co-conspirators, Harvey stated, "[f]ollowing Mahesh's previous counsel, I am not going into detail in writing" on the subject of the agreement by P&W not to hire certain employees from QuEST. December 15 Indictment, ¶ 29(e).

149.    In a January 2015 statement by a QuEST manager to defendant Harvey and two other QuEST executives regarding his recent discussion with defendant Houghtaling about ceasing poaching between QuEST and Belcan, the QuEST manager stated, "[w]hile I want you to be informed, I would rather not have any other folks know

where this info came from. I request that this email not be forwarded." December 15

Indictment, ¶ 29(f).

150.    Indeed, the federal investigator from the Defense Criminal Investigative

Service (DCIS) of the United States Department of Defense, Office of the Inspector

General that wrote the Affidavit in Support of Criminal Complaint and Arrest Warrant

filed by the Department of Justice found that, although some individuals heard rumors of

the agreement, likely from the select few direct victim-witnesses who were denied

positions due to the conduct, in many instances even victim-witnesses were unaware of

the actions taken by Defendants to block their job applications. DCIS Affidavit, ¶ 54.

Moreover, the far-reaching impact of the restrictions on recruiting and hiring, which

extends to those Engineers who had not directly applied for employment with another

one of Defendants, ensures that the vast majority of the Class, including Plaintiff, were

unaware of the No-Poach Agreement because of Defendants' active concealment of the

agreement. As for those members of the Class whose compensation was directly affected

by the conduct without such members actively searching for a new position with a

Defendant, the No-Poach Agreement was undiscoverable through any reasonable inquiry.

151.    But for information made public in the DCIS Affidavit, Plaintiff would

have remained unaware that the No-Poach Agreement existed. Because of the secrecy of

the No-Poach Agreement and Defendants' acts of concealment, Plaintiff and the Class

did not and could not have known before December 9, 2021, when the DOJ filed its

partially unsealed criminal complaint and arrest warrant for defendant Mahesh Patel, that

Defendants were engaged in an illegal conspiracy to suppress Engineers' wages by

restraining recruitment and hiring of one another's Engineers. Further, the secrecy of the

No-Poach Agreement and Defendants' acts of concealment would have thwarted any

reasonable effort to discover the No-Poach Agreement before that date.

**V.      Class action allegations.**

152.      Plaintiff brings this action on behalf of himself and all others similarly

situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The

Class is defined as:

> All natural persons who worked at one or more of the Defendants as
> Engineers from January 2011 through such time as Defendants'
> anticompetitive conduct ceased ("Class Period"). Excluded from the Class
> are members of Defendants' boards of directors, Defendants' senior
> executives who entered into and/or enforced the No-Poach Agreement, and
> any and all judges assigned to hear or adjudicate any aspect of this litigation
> and their judicial staff.

153.      Plaintiff does not yet know the exact size of the Class because such

information is in the exclusive control of Defendants. Based upon publicly available

information, there are thousands of Class members. Joinder of all members of the Class is

therefore impracticable.

154.    Class members are easily ascertainable based on, among other things, the Defendants' employment records.

155.    There are many questions of law and fact common to the Class as a whole, including:

(a)    Whether, when, and how Defendants entered into, operated, monitored, and enforced the No-Poach Agreement;

(b)    Whether Defendants concealed the existence of the No-Poach Agreement from Plaintiff and the members of the Class;

(c)    Whether Defendants' conduct violated Section 1 of the Sherman Act;

(d)    Whether the No-Poach Agreement is a *per se* violation of the Sherman Act;

(e)    Whether the No-Poach Agreement restrained trade, commerce, or competition for Engineers between Defendants;

(f)    Whether Plaintiff and the Class have suffered antitrust injury; and

(g)    the appropriate measure of damages.

156.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual members of the Class.

157.    Plaintiff's claims are typical of the claims of the Class.

158.    Plaintiff will fairly and adequately represent the interests of, and have no conflicts of interest with, the Class.

159.    Plaintiff has retained counsel experienced in antitrust and class action litigation to represent himself and the Class.

160.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications and be inefficient and burdensome to the parties and the Court.

## FIRST CLAIM FOR RELIEF
### (Violation of the Sherman Act, 15 U.S.C. § 1)

161.    Plaintiff realleges and incorporates by reference each of the averments contained in the preceding paragraphs of this complaint.

162.    Defendants entered into and engaged in the unlawful horizontal No-Poach Agreement in restraint of trade and commerce, as described above, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The No-Poach Agreement is a *per se* violation of Section One of the Sherman Act.

163.    The acts done by Defendants as part of, and in furtherance of, their agreements, understandings, contracts, combinations, or conspiracies were authorized, ordered, or done by their respective senior executives while actively engaged in the management of Defendants' affairs.

164.    Defendants collectively possess monopsony power in the relevant market. Through their No-Poach Agreement, Defendants harmed competition in the relevant market.

165.    The unlawful No-Poach Agreement had the following effects, among others:

> (a)    Competition between Defendants for Engineers was suppressed, restrained, or eliminated; and

> (b)    Plaintiff and members of the Class have received lower compensation from Defendants than they otherwise would have received in the absence of the No-Poach Agreement and, as a result, have been injured and have suffered damages in an amount according to proof at trial.

166.    Defendants' No-Poach Agreement had no procompetitive benefits or justifications. The No-Poach Agreement provided no efficiencies or other benefits that would offset the substantial competitive harms described above.

167.    As a direct and proximate result of Defendants' illegal No-Poach Agreement, members of the Class have suffered injury and have been deprived of the benefits of free and fair competition for their labor on the merits.

168.    Accordingly, Plaintiff and members of the Class seek three times their damages caused by Defendants' violation of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, injunctive relief, and a declaration that such agreement is unlawful.

## VI.    Prayer for relief.

A.    WHEREFORE, Plaintiff prays that this Court enter judgment on their behalf and that of the Class by adjudging and decreeing that:

B.    This action may be maintained as a class action, with Plaintiff as the designated Class representative and his counsel as Class counsel;

C.    Defendants engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and that Plaintiff and the members of the Class have been damaged and injured in their business as a result of this violation;

D.      The alleged conduct be adjudged and decreed to be a *per se* violation of Section 1of the Sherman Act, 15 U.S.C. § 1, or in the alternative, a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the quick look or rule of reason frameworks;

E.      Plaintiff and the members of the Class recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants complained of herein and that judgment be entered against Defendants for the amount so determined;

F.      Judgment be entered against Defendants in favor of Plaintiff and each member ofthe Class, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them;

G.      For prejudgment and post-judgment interest;

H.      For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

I.      For attorneys' fees;

J.      For costs of suit; and

K.      For such other and further relief as the Court may deem just and proper.

## VII.   Jury demand.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all claims and issues so triable.

Dated December 29, 2021 /s/ ct21994
Daniel J. Krisch
Fed. Bar #ct21994
HALLORAN SAGE LLP
225 Asylum St.
Hartford, CT  06103
(860) 522-6103
krisch@halloransage.com

Jason A. Zweig*
jaz@kellerlenkner.com
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
(312) 741-5220
Zina Bash*
zina.bash@kellerlenkner.com
111 Congress Avenue, Suite 500
Austin, TX 78701
(501) 690-0990
KELLER LENKNER LLC
*Attorneys for Plaintiff*

*Pro hac vice forthcoming